UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GREGORY RANDY JULIAN                          CIVIL ACTION

VERSUS                                        NO. 10-4671

SHERIFF MARLIN GUSMAN ET AL.                  SECTION "B" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Gregory Randy Julian, is a prisoner currently incarcerated in the Orleans Parish Prison system ("OPP"). He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Orleans Parish Sheriff Marlin N. Gusman, the OPP Medical Staff, M. Terral and Major Winfield. Julian alleges that, while incarcerated in OPP, he was improperly housed with convicted Department of Corrections ("DOC") inmates and received inadequate medical treatment for hypertension and diabetes. He further alleges that he was denied adequate access to a law library and a responsive administrative remedies procedure ("ARP"). He seeks monetary compensation and injunctive relief, including "immediate forth-with transfer to an appropriate D.O.C. facility where my medical needs may be met, that are being denied to me here at Orleans Parish Prison." Record Doc. No. 1 (Complaint at ¶¶ IV and V and attached exhibits).

On February 17, 2011, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Tim Richardson, counsel for defendants. Plaintiff

was sworn and testified for all purposes permitted by <u>Spears v. McCotter</u>, 766 F.2d 179

(5th Cir. 1985), and its progeny.

## **THE RECORD**

Julian testified that he is currently incarcerated in OPP based upon a January 5,

2011, conviction for possession with intent to distribute marijuana and cocaine, for which

he is serving a sentence of seven (7) years in prison. He stated that he has been in OPP

concerning these charges since his arrest in 2009.

As to his claim that grievance procedures at OPP are inadequate, Julian stated that

"it takes 30 days, sometimes 45 days" for prison officials to answer grievances. He

referred the court to his own grievances that he attached to his lawsuit, Record Doc.

No. 1 (attachments to complaint); for example, a September 15, 2010 grievance

concerning his request for envelopes and writing materials to address legal issues in his

criminal case. Julian complained that the response to this grievance did not arrive until

October 27, 2010, and merely stated that he had already been seen by the legal advisor,

who issued him a form. He said his complaints about the OPP grievance procedure are

that responses take too long and that he did not receive a law book he had requested

because the response to his grievance was that the book he requested was already on loan

to another inmate.

As to his medical care claim, Julian testified that it took months after his arrest

before OPP officials correctly treated his hypertension. He stated that he had high blood

pressure before he entered OPP.  He acknowledged that he had received a copy of his OPP medical records that I previously ordered, Record Doc. Nos. 6 and 15, and that they are accurate.

Julian confirmed that, when he entered the jail on June 14, 2009, he was screened for medical conditions, and that he told OPP booking officials that he had high blood pressure, for which he was taking a medication called atenolol.[1]  He said his blood pressure was checked by a nurse.  He confirmed that he made a sick call request on September 16, 2009, concerning both a staph infection and his high blood pressure, and he was seen by a doctor on October 5, 2009, which was the first time he saw a doctor for his high blood pressure in OPP.  He said that, on that date, "they ran some tests on me," checked his blood pressure, and told him it would be treated.

He confirmed the notation in his medical record dated October 5, 2009, that he was assigned on that date to a "hypertension chronic care treatment plan," including blood pressure checks every four to five weeks and administration of a blood pressure medication called hydrochlorothiazide.  Julian stated that he previously had always taken atenolol for his high blood pressure, and that was the medication he wanted instead of hydrochlorothiazide.  He said he was nevertheless given hydrochlorothiazide at OPP and

---

[1]Atenolol (brand name: Tenormin) "is a . . . drug belonging to . . . a class of drugs used primarily in cardiovascular diseases.  Introduced in 1976, atenolol was developed . . . [for] the treatment of hypertension.  The chemical works by slowing down the heart and reducing its workload." http://en.wikipedia.org/wiki/Atenolol (last visited Feb. 28, 2011).

that he took it for about three months, but it did not work.  He confirmed the notation in his medical records that his blood pressure was checked at OPP in January 2010, and it was still high; the medical record states that his blood pressure control was then "poor." He confirmed that his hydrochlorothiazide dosage was increased on that date, and he was given and took the increased dosage for another 90 days, but it still failed to control his high blood pressure.

Julian confirmed the notation in his medical records dated February 26, 2010, stating that his medication was changed on that date from hydrochlorothiazide to Lycinipril, another blood pressure medication.  He said he took the new medication for 60 to 90 days, his blood pressure was checked, "and it still wasn't working."  He also confirmed the reference in his medical records that, when he reported that the new medication still was not working, OPP medical personnel checked him for diabetes, but he was found not to be a diabetic.

Julian confirmed the accuracy of the medical record dated April 2, 2010, noting that he was seen on that date by Dr. Gautreaux, who prescribed three medications for him.  He said he received those three medications until they were discontinued in November 2010, when he was placed on atenolol, the medication he had wanted all along, which was prescribed by a nurse at OPP.  He said he has been taking atenolol at OPP ever since that date, that his blood pressure continues to be monitored every three weeks, and that it is now fully under control.

4

Julian summarized that his complaint in this case is that medical staff at OPP gave him medication for his high blood pressure that was ineffective and that there was a months-long delay before he was finally provided with effective medication for his hypertension. He complained that if OPP officials had simply given him atenolol, the medication he requested when he first arrived, instead of trying the other blood pressure medications, it would not have taken so long to get his hypertension under control.

As to his claim that he did not receive adequate access to the law library at OPP, Julian testified that when he has requested particular law books, reported court decisions or the use of a notary at the jail, he has received responses stating that jail officials could not provide him with a notary or the particularly requested legal materials. He said that, although he was provided with writing materials and envelopes, he was not provided with specific books or cases that he requested.

Julian testified that he needed a notary and particular legal materials so that he could conduct research about the criminal charges that were then pending against him. He stated that he wanted to review cases similar to his own criminal case. He stated that he had no attorney for the first ten (10) months after his arrest. He testified that a lawyer was appointed to represent him in 2009 or 2010 and that the lawyer thereafter represented him in his criminal case until his conviction. He said that, until a lawyer was appointed to represent him in his criminal case, "I would be put on the docket and brought to court and set back, I would never get in."

5

Plaintiff testified that, before a lawyer was appointed to represent him, he wanted to file a motion for a speedy trial because his proceedings were being delayed. He acknowledged that he wrote to the court during this time, sometime in May or June 2010, to ask about getting an attorney. He estimated that he wrote to the court "about three times" before an attorney was appointed to represent him, and that each time he asked to move forward with his case as soon as possible with an attorney. He testified that he pled guilty to the criminal charges against him in January 2011 and was represented by an attorney at his guilty plea.

Julian stated that he also complains in this case that he was housed at OPP with convicted inmates during 2010 while he was still a pretrial detainee. He estimated that of the 34 or 35 inmates with whom he was housed in an open dorm containing beds, seven or eight would be convicted DOC inmates at any given time, while the other 24 or so were pretrial detainees.

Asked what problems he experienced as a result of being housed with some convicted inmates, he testified that "it was very uncomfortable . . . some situations . . . it's like fights or something break out." He testified that he was <u>not</u> involved in any fights himself, but he was concerned during that time that he might become involved in a fight. He said that he was worried that if he became involved in a fight with a DOC inmate, he might be "re-booked," but he conceded that he did not become involved in any fights and that he was not re-booked.

Julian said he was in this housing situation with some DOC inmates for about nine months.  He conceded that he had a record of previous felony convictions himself, including felon in possession of a firearm and simple burglary, before this particular arrest.  He reiterated, however, that he should have been housed only with pretrial detainees to avoid any risk that he might become involved in an altercation with DOC inmates, although no such altercations actually occurred.

Julian also complained that, now that he has been convicted, he should be considered a DOC inmate and that he is not receiving the same kinds of privileges that he would be receiving if he was incarcerated in a DOC institution.  He said he wanted to be transferred from OPP to a DOC facility so that he could have access to facilities, programs and a law library that would help him.  He said he still has two years to make any filings in connection with his criminal case.  Julian acknowledged that he has been provided with writing materials necessary to make submissions concerning his criminal case, but he complained that he needs particular legal research materials to complete a brief on which he is currently working.

<u>ANALYSIS</u>

I.      <u>STANDARDS OF REVIEW</u>

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless whether it has also been filed in forma pauperis.  28 U.S.C. § 1915A(a); <u>Lewis v. Estes</u>, 242 F.3d 375, 2000 WL

1673382, at *1 (8th Cir. 2006); Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004); Martin v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998). Such complaints by prisoners must be dismissed upon review if they are frivolous or fail to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended). A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. Spears, 766 F.2d at 180. "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." Davis, 157 F.3d at 1005. The information elicited at

such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a Spears hearing."  Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).  However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"  Gobert v. Caldwell, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a Spears hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the

facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)).  "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269.  A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint must be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous because it lacks an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaint, as amended by his testimony at the Spears hearing, fails to state a cognizable claim of violation of his constitutional rights, even under the broadest reading.[2]

---

[2]Pro se civil rights complaints must be broadly construed, Moore, 30 F.3d at 620, and I have broadly construed the complaint in this case.

II.    <u>INADEQUATE GRIEVANCE PROCEDURE</u>

Julian testified that, although he filed grievances through the available ARP at OPP, the responses he received took too long and did not result in any relief for his complaints.  This complaint fails entirely to state a claim for relief under Section 1983.  The timing and content of defendants' responses to plaintiff's ARP requests do not constitute a constitutional violation.

The Fifth Circuit has held that an inmate "does not have a federally protected liberty interest in having . . . grievances resolved to his satisfaction.  As he relies on a legally nonexistent interest, any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless."  <u>Geiger v. Jowers</u>, 404 F.3d 371, 374-75 (5th Cir. 2005) (citing <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995); <u>Orellana v. Kyle</u>, 65 F.3d 29, 31-32 (5th Cir. 1995)); <u>accord</u> <u>Bell v. Woods</u>, 382 F. App'x 391, 392 (5th Cir.), <u>cert. denied</u>, 131 S. Ct. 797 (2010); <u>Johnson v. Livingston</u>, 360 F. App'x 531, 532 (5th Cir.), <u>cert. denied</u>, 131 S. Ct. 106 (2010).  "Additionally, [plaintiff] could not show any injury from the failure [adequately] to consider his grievances because the alleged [actions of jail officials of which] he complained . . . in the grievances did not implicate his constitutional rights."  <u>Bell</u>, 382 F. App'x at 392.

In this case, plaintiff commenced the prison's ARP by filing grievances.  His complaint is that it took 30-45 days for prison officials to respond and that he was not satisfied with the response.  In the constitutional sense, an ARP, at most, may be viewed

11

as a means of effectuating plaintiff's First Amendment right to petition the government for redress of grievances.  In this instance, plaintiff's grievances were received and processed through the ARP, although the ARP did not end with the results that he wanted.  The Fifth Circuit has indicated that allegations that a prison official has failed adequately to follow particular prison rules, regulations or procedures, such as an ARP, cannot support a Section 1983 claim, without an independent constitutional violation. Eason v. Thaler, 73 F.3d 1322, 1325-26 (5th Cir. 1996).  "[A] prison official's failure to follow the prison's own policies, procedures or regulations does not constitute a violation of due process."  Stanley v. Foster, 464 F.3d 565 (5th Cir. 2006) (quoting Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996)).

No independent, nonfrivolous constitutional violation has been alleged in this case.  Thus, defendants' failures to respond to Julian's ARP grievances within the time period or with the results he wished in no way implicate his constitutional rights that might serve as a basis for Section 1983 relief.

III.   HOUSING CLASSIFICATION/DOC INMATES AND PRETRIAL DETAINEES

Julian alleges that, as a pretrial detainee, he was improperly housed with convicted inmates, although no actual injury or physical harm resulted from his housing

assignment.  In <u>Jones v. Diamond</u>, 636 F.2d 1364 (5th Cir. 1981),[3] the en banc Fifth

Circuit stated that

> [t]he confinement of pretrial detainees indiscriminately with convicted
> persons is unconstitutional unless such a practice is "reasonably related to
> the institution's interest in maintaining jail security," or physical facilities
> do not permit their separation.  Of course, if a particular pretrial detainee
> has a long record of prior convictions or is likely to be violent, imposition
> of greater security measures is warranted . . . .  Nonetheless, pretrial
> detainees have a due process right to be considered individually to the
> extent security and space requirements permit.

<u>Id.</u> at 1374 (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 531 (1979)) (additional citations

omitted).  Thus, the Fifth Circuit in <u>Jones</u> recognized that the housing of pretrial

detainees with <u>convicted</u> inmates may raise concerns about the due process rights of the

<u>pretrial detainees</u>, but only if the pretrial detainees' classification together with convicted

inmates is handled indiscriminately without justification.  <u>Pembroke v. Wood County</u>,

981 F.2d 225, 229 (5th Cir. 1993); <u>Lathers v. Nelson Coleman Corr. Ctr.</u>, 2010 WL

1489903, at *7-8 (E.D. La. Mar. 22, 2010) (Shushan, M.J.), <u>report & recommendation

adopted</u>, 2010 WL 1485468 (E.D. La. Apr. 13, 2010) (McNamara, J.).  However, the

Fifth Circuit also recognized that the housing of pretrial detainees with convicted inmates

is permissible under some circumstances.

Significantly, the classification of inmates is an administrative function of the

prison.  <u>Jones</u>, 636 F.2d at 1376.  Courts accord great deference to prison officials'

---

[3]<u>Overruled on other grounds by</u> <u>Int'l Woodworkers v. Champion Int'l Corp.</u>, 790 F.2d 1174 (5th
Cir. 1986), <u>aff'd sub. nom.</u> <u>Crawford Fitting Co. v. J.T. Gibbons, Inc.</u>, 482 U.S. 437 (1987).

administrative decisions and will not interfere with legitimate administration without a constitutional violation.  Bell, 441 U.S. at 547-48; Smith v. Bingham, 914 F.2d 740, 742 (5th Cir. 1990).  "Inmates have a federal right to due process at prison classification . . . only if state law contains 'substantive predicates' limiting the prison administrators' discretion to classify, assign, and punish inmates."  Ricker v. Leapley, 25 F.3d 1406, 1409 (8th Cir. 1994); accord Woods v. Edwards, 51 F.3d 577, 582 (5th Cir. 1995) (citing Hewitt v. Helms, 459 U.S. 460, 469-70 (1983)); Canterino v. Wilson, 869 F.2d 948, 953 (6th Cir. 1989) (citing Hewitt, 459 U.S. at 472).  "Classification of inmates in Louisiana is a duty of the [jailer] and an inmate has no right to a particular classification under state law."  Woods, 51 F.3d at 581-82 (quotation omitted).

Thus, "[i]nmates have no protectable property or liberty interest in custodial classification.  The classification of prisoners is a matter within the discretion of prison officials.  Absent an abuse of discretion, federal courts are loathe to interfere with custodial classifications established by prison officials."  Whitley v. Hunt, 158 F.3d 882, 889 (5th Cir. 1998) (citations omitted), abrogated on other grounds by Booth v. Churner, 532 U.S. 732, 735 (2001); accord Jones v. Roach, 196 F. App'x 287, 288 (5th Cir. 2006); Wilkerson v. Stalder, 329 F.3d 431, 436 (5th Cir. 2003).

The Fifth Circuit's decision in Jones v. Diamond provides that pretrial detainees have a right to be considered individually only to the extent that security and space requirements permit, and that imposition of greater security measures is warranted if an

14

inmate has a long record of prior convictions or is likely to be violent.  Jones, 636 F.2d. at 1374.  Considering the individualized circumstances of Julian's case, it cannot be concluded that housing Julian with convicted inmates was unconstitutional.

Julian testified that he had a prior record of at least two felony convictions at the time of his arrest.  He subsequently pled guilty to a third.  He also testified that he experienced no incidents of any kind between himself and any DOC inmate, or between convicted inmates and pretrial detainees generally.  According to his own testimony, his dorm assignment included about three times the number of pretrial detainees as DOC inmates.  In the absence of any incident or other harm, and considering Julian's acknowledged own extensive prior history of convictions, his subjective belief that he should have been housed exclusively with pretrial detainees is unsupported and insufficient for the court to conclude that prison officials' discretionary decisions concerning housing a few convicted inmates with mostly pretrial detainees were unconstitutional. The circumstances described in Julian's own testimony do not establish the objective unreasonableness of this particular housing decision.

In this instance, housing Julian together with convicted inmates cannot be characterized as arbitrary or indiscriminate or as an abuse of the discretion the law assigns to prison officials, with which this court should not interfere.  No violation of Julian's constitutional rights occurred under these circumstances.

15

IV.   <u>MEDICAL CARE</u>

Julian was a pretrial detainee during the time period about which he complains. He asserts that he received inadequate medical care for his high blood pressure, particularly in that he was given types of medication for hypertension that were not the atenolol he preferred and knew to be effective.

Before the Fifth Circuit's decision in <u>Hare v. City of Corinth</u>, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest.  <u>Bell v. Wolfish</u>,  441 U.S. 520, 539 (1979); <u>Cupit v. Jones</u>, 835 F.2d 82, 85 (5th Cir. 1987); <u>Mayweather v. Foti</u>, 958 F.2d 91 (5th Cir. 1992).  The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees."  <u>Pfannstiel v. City of Marion</u>, 918 F.2d 1178, 1186 (5th Cir. 1990), <u>abrogated on other grounds as recognized in Martin v. Thomas</u>, 973 F.2d 449, 455 (5th Cir. 1992).

In <u>Hare</u>, however, the Fifth Circuit held:

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650.  The Fifth Circuit explained that for the Bell "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645.  If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission, and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply.  Shepherd v. Dallas County, 591 F.3d 445, 452 (5th Cir. 2009) (citing Bell, 441 U.S. at 539; Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997); Hare, 74 F.3d at 649); Tamez v. Manthey, 589 F.3d 764, 769-70 (5th Cir. 2009) (citing Scott, 114 F.3d at 53; Hare, 74 F.3d at 649).

In Estelle, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Estelle, 429 U.S. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Tamez, 589 F.3d at 770; Hare, 74 F.3d at 650.  "Deliberate indifference" means that a prison official is liable "only if he knows

17

that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it." <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994). The <u>Farmer</u> definition applies to Eighth Amendment medical claims. <u>Reeves</u>, 27 F.3d at 176.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. If the court finds that one of the components of the test is not met, it need not address the other component. <u>Davis</u>, 157 F.3d at 1005. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." <u>Farmer</u>, 511 U.S. at 834 (quotation omitted). Thus, plaintiff must show that defendants "exhibited deliberate indifference to his serious medical needs." <u>Cooper v. Johnson</u>, 353 F. App'x 965, 967 (5th Cir. 2009) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991)); accord <u>Harris v. Hegmann</u>, 198 F.3d 153, 159 (5th Cir. 1999); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993).

Further, plaintiff must establish that defendant possessed a culpable state of mind. <u>Farmer</u>, 511 U.S. at 838 (citing <u>Wilson</u>, 501 U.S. at 298). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837; <u>accord Tamez</u>, 589 F.3d at 770 (citing <u>Thompson v. Upshur County</u>, 245 F.3d

18

447, 458-59 (5th Cir. 2001)).  "Such a showing requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would <u>clearly evince a wanton disregard</u> for any serious medical needs.'"  <u>Brewster v. Dretke</u>, 587 F.3d 764, 770 (5th Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 3368 (2010) (quoting <u>Domino v. Tex, Dep't of Crim. Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001)) (emphasis added).

> The Supreme Court has recently reaffirmed that "'deliberate indifference' is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . .  The "deliberate indifference" standard permits courts to separate omissions that amount to an intentional choice from those that are merely unintentionally negligent oversight[s].

<u>Southard v. Tex. Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (quoting <u>Bd. of County Comm'rs v. Brown</u>, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis added); <u>accord</u> <u>Tamez</u>, 589 F.3d at 770.  "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference."  <u>Norton v. Dimazana</u>, 122 F.3d 286, 291 (5th Cir. 1997).

In the instant case, plaintiff's pleadings, as expanded by his testimony, establish that nothing more than episodic acts or omissions as defined in <u>Hare</u> are at issue.  <u>See Tamez</u>, 589 F.3d at 770 (defendants' alleged refusal "to provide [prisoner] with immediate medical treatment qualifies as an 'episodic act or omission'").  Therefore, the "deliberate indifference" standard applies and Julian must allege facts sufficient to

19

establish that defendants knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.  In this case, plaintiff wholly fails to allege facts sufficient to satisfy any of the essential elements of his claim, including especially the stringent "deliberate indifference" standard.

Initially, it cannot be concluded that the condition he described, consisting of hypertension, presented a serious medical need that posed a substantial risk of harm in Julian's particular circumstances.  As Julian conceded during his testimony, he did not suffer "a life-long handicap or permanent loss" of the type required to constitute a serious medical need for constitutional purposes.  See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (citing Monmouth County v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) ("Where the delay [in medical care] results in an inmate's suffering 'a life-long handicap or permanent loss, the medical need is serious.'")); Dickson v. Colman, 569 F.2d 1310, 1311 (5th Cir. 1978) (no serious medical need was demonstrated when plaintiff's high blood pressure presented no "true danger" or "serious threat" to his health).  While hypertension certainly has the potential to develop into a serious medical need as defined for constitutional purposes, Julian acknowledged in his testimony that his condition has been brought under control with the medication and ongoing monitoring that is now occurring in OPP.

Even assuming, however, without concluding that plaintiff's hypertension presented a serious medical need for constitutional purposes, Julian has alleged facts,

confirmed by his testimony and the medical records, that negate any inference of deliberate indifference by jail officials.  His complaint, as amended by his testimony and confirmed by the medical records, shows that he received constitutionally adequate medical care while incarcerated at the jail.  Julian testified and his medical records confirm that, after about four months of delay, he was seen by a doctor at the jail and placed on a "hypertension chronic care treatment plan" that included medication and periodic checks of his blood pressure levels.  Although he was prescribed blood pressure medications that were different from the atenolol he requested, and the different medications were ineffective, his condition was monitored, addressed and ultimately brought under control when atenolol was finally prescribed and administered.

This record does not support an inference that defendants were deliberately indifferent to plaintiff's serious medical needs in the constitutional sense.  See, e.g., Raspberry v. Johnson, 281 F.3d 1279, 2001 WL 1692494, at *1 (5th Cir. 2001) (citing Domino, 239 F.3d at 754) (Plaintiff with injured hand and bruises failed to allege deliberate indifference to serious medical needs when he was examined by medical personnel and the injuries healed on their own.); Greer v. Tran, 124 F. App'x 261, 262 (5th Cir. 2005) (no deliberate indifference to serious medical needs when inmate was tested for diabetes mellitus, which was ruled out, although he ultimately died after falling into a diabetic ketoacidotic coma); Harris v. Donaldson, 71 F.3d 876, 1995 WL 725438, at *2 (5th Cir. Nov. 3, 1995) (no deliberate indifference where prisoner received medical

treatment for diabetes, including blood monitoring, medication and other attention, rendering his Section 1983 medical care claim merely a "quarrel with the quality and quantity of his medical treatment" for his chronic condition).

Although Julian has alleged delay in receiving medical care in that he did not receive the treatment he thought was necessary quickly enough, and he has expressed dissatisfaction with the overall speed, quality and initial effectiveness of treatment, none of his allegations rise to the level of deliberate indifference necessary to establish a constitutional violation cognizable under Section 1983.

> [T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

Gobert, 463 F.3d at 346 (footnotes, citations and internal quotations omitted). No such showing has been made on the current record. In Julian's case, the decision initially to prescribe hypertensive medications other than atenolol was a classic example of the exercise of "medical judgment," which, even if incorrect, cannot serve as the basis for a finding of deliberate indifference in the constitutional sense.

Mere delay in receiving care is not in and of itself a constitutional violation. Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006); Mendoza, 989 F.2d at 195; Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990). Regardless of the length of delay,

22

plaintiff at a minimum must show deliberate indifference to serious medical needs. Wilson, 501 U.S. at 298.  No such showing can be made in this case in light of the continuing and ultimately successful medical attention Julian has received for his hypertension during his incarceration.

Contentions like Julian's that amount to a mere disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim.  "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."  Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see also Rowe v. Norris, 198 F. App'x 579, 581 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson, 910 F.2d at 284 (allegations establishing provision of medical treatment are inconsistent with inference of deliberate indifference); Williams v. Browning, No. V-03-157, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11,

23

2006) (inmate with diabetes, hypertension, anxiety and chronic knee ailment who alleged that he was unable to obtain his medications timely, but did not establish any substantial harm from the delay, failed to state a claim for deliberate indifference).

Under these circumstances, plaintiff cannot state a cognizable Section 1983 claim that defendants were deliberately indifferent to his serious medical needs.  For all of the foregoing reasons, plaintiff's complaints in this case about his medical care advance a legally frivolous argument and fail to state a claim for relief based upon violation of his constitutional rights under Section 1983.

V.    LAW LIBRARY

Plaintiff testified that he was denied his First Amendment right of access to the courts because of an inadequate law library.  Prisoners have a First Amendment right of meaningful access to the courts through adequate law libraries or assistance from legally trained personnel.  Bounds v. Smith, 430 U.S. 817, 828 (1977); Dickinson v. TX, Fort Bend County, 325 F. App'x 389, 390 (5th Cir. 2009); Sandoval v. Johns, 264 F.3d 1142, 2001 WL 822779, at *1 (5th Cir. 2001); McDonald v. Steward, 132 F.3d 225, 230 (5th Cir. 1998); Degrate v. Godwin, 84 F.3d 768, 768-69 (5th Cir. 1996).  However, a prison need not provide its inmates with a library that results in the best possible access to the courts, but must provide a library or other assistance that meets minimum constitutional standards of providing access to the courts.  Petrick v. Maynard, 11 F.3d 991, 994 (10th Cir. 1993); Johnson v. Moore, 948 F.2d 517, 521 (9th Cir. 1991); Hargrove v.

Henderson, No. 95-1601-CIV-T-17A, 1996 WL 467516, at *10 (M.D. Fla. Aug. 13, 1996), aff'd, 124 F.3d 221 (11th Cir. 1997); U.S. v. Janis, 820 F. Supp. 512, 515-16 (S.D. Cal. 1992), aff'd, 46 F.3d 1147 (9th Cir. 1995).

"While the precise contours of a prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court." Vaccaro v. United States, 125 F.3d 852, 1997 WL 574977, at *1 (5th Cir. 1997) (quotation omitted) (emphasis added); accord Norton, 122 F.3d at 290; Eason v. Thaler, 73 F.3d 1322, 1328 (5th Cir. 1996).

Significantly, to state a claim that his constitutional right of access to the courts was violated, Julian must demonstrate that his position as a litigant was actually prejudiced. Lewis v. Casey, 518 U.S. 343, 356 (1996); Cochran v. Baldwin, 196 F. App'x 256, 257-58 (5th Cir. 2006); Smith v. Polunsky, 233 F.3d 575, 2000 WL 1468717, at *1 (5th Cir. 2000); Eason, 73 F.3d at 1328. The inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Lewis, 518 U.S. at 351.

Julian wholly fails to establish the essential elements of a First Amendment claim detailed above, either in his complaint or his testimony. His testimony establishes that he has been provided with and has in fact had the ability to prepare and transmit legal

documents to the courts.  In addition, no actual prejudice to his position as a litigant has occurred.

As an initial matter, Julian acknowledged that he was represented by an attorney in his criminal case, including before and at the time he entered his guilty plea.  Under these circumstances, plaintiff's right of access to the courts, as guaranteed by the Constitution and interpreted by <u>Bounds</u>, was clearly satisfied by his representation by counsel in his criminal proceedings.  <u>Wilson v. Blankenship</u>, 163 F.3d 1284, 1291 (11th Cir. 1998); <u>Schrier v. Halford</u>, 60 F.3d 1309, 1313-14 (8th Cir. 1995); <u>Mackin v. Carpenter</u>, 988 F.2d 1212, 1993 WL 82306, at *3 (5th Cir. 1993); <u>Mann v. Smith</u>, 796 F.2d 79, 83 (5th Cir. 1986); <u>Morrow v. Harwell</u>, 768 F.2d 619, 623 (5th Cir. 1985).

It is clear that no actual legal prejudice to Julian's position as a litigant of the type required by <u>Lewis</u> was caused by any action or omission of the defendants.  "[C]ausation is an element of a section 1983 claim; [defendants'] actions must have actually caused the deprivation . . . of which [plaintiff] complains."  <u>Hart v. O'Brien</u>, 127 F.3d 424, 446 (5th Cir. 1997), <u>abrogated in part on other grounds as recognized in</u> <u>Spivey v. Robertson</u>, 197 F.3d 772 (5th Cir. 1999); <u>accord</u> <u>Brown v. Bryan County</u>, 219 F.3d 450, 457 (5th Cir. 2000).  In <u>Lewis</u>, the Supreme Court made clear that an inmate <u>must establish actual injury</u> to state a claim for denial of his right of access to the courts.

Julian acknowledged in his testimony that, even before counsel was appointed to represent him, he was able to send the court several written requests that he be appointed

counsel and that his case move forward.  He testified that he still has time to file for post-conviction relief as to his guilty plea and that he is actively working on a brief to submit to the court for that purpose.  For all of the forgoing reasons, Julian's claim concerning inadequate access to a law library at OPP is legally frivolous and fails to state a claim upon which relief can be granted under Section 1983.

VI.   <u>NO RIGHT TO TRANSFER TO ANOTHER PRISON</u>

At the conclusion of his <u>Spears</u> hearing testimony, Julian made it clear that his principal claim is that, now that he has been convicted of the criminal charges against him, he should be transferred from OPP to a DOC facility, where he can have access to facilities and programs that will be more helpful to him than those provided at OPP.  This assertion wholly fails to state a claim upon which relief can be granted in a Section 1983 complaint.

Inmates have no protected liberty interest in specific educational, rehabilitative or self-improvement opportunities.  <u>Lato v. Attorney Gen.</u>, 773 F. Supp. 973, 978 (W.D. Tex. 1991).  "[A] state has no constitutional obligation to provide basic educational or vocational training to prisoners." <u>Beck v. Lynaugh</u>, 842 F.2d 757, 762 (5th Cir. 1988) (citing <u>Newman v. Alabama</u>, 559 F.2d 283, 292 (5th Cir. 1977), <u>rev'd in part on other grounds sub nom.</u> <u>Alabama v. Pugh</u>, 438 U.S. 781 (1978)); <u>accord</u> <u>Miles v. Windham Sch. Dist.</u>, 78 F. App'x 418, 419 (5th Cir. 2003); <u>Honshul v. Foti</u>, 51 F.3d 1045, 1995 WL 153425, at *2 (5th Cir. 1995).  Prisoners have no constitutional right to participate

in educational, work release, rehabilitation or other self-improvement programs, particularly when no such programs exist at the facility.  Joseph v. U.S. Fed. Bureau of Prisons, 232 F.3d 901, 2000 WL 1532783, at *1-2 (10th Cir. Oct. 16, 2000); Wishon v. Gammon, 978 F.2d 446, 450 (8th Cir. 1992); Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir. 1988); Newman, 559 F.2d at 292, rev'd in part on other grounds, 438 U.S. at 781; Oladipupo v. Austin, 104 F. Supp. 2d 626, 638 (W.D. La. 2000).

Julian's complaint that he should have been transferred to a DOC facility immediately upon his sentencing fails to state a cognizable Section 1983 claim.  It is clear that a prisoner has no right of any kind springing from the Constitution itself to be housed in any particular facility or to be transferred from one prison facility to another, even if life in one prison may be much more disagreeable than in another.  Olim v. Wakinekona, 461 U.S. 238, 245-46 (1983); Meachum v. Fano, 427 U.S. 215, 224-225 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976); Fuselier v. Mancuso, 354 F. App'x 49, 49 (5th Cir. 2009) (citing Olim, 461 U.S. at 245; Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996)); Biliski v. Harborth, 55 F.3d 160, 162 (5th Cir. 1995).

Constitutionally protected liberty interests may be created not only by the Constitution itself, however, but also by state law.  Not every state statute creates a liberty interest protected by the Constitution and cognizable under Section 1983.  On the contrary, a state statute creates constitutionally protected interests only if it establishes that state officials must take mandatory, non-discretionary actions in connection with the

28

life, liberty or property of citizens. <u>Olim</u>, 461 U.S. at 249; <u>Taylor v. Jagers</u>, 115 F. App'x

682, 684 (5th Cir. 2004) (citing <u>Jackson v. Cain</u>, 864 F.2d 1235, 1250 (5th Cir. 1989));

<u>Lathers</u>, 2010 WL 1489903, at *3, <u>report & recommendation adopted</u>, 2010 WL

1485468.  Thus, state statutes that vest officials with broad discretion to carry out their

official functions do <u>not</u> create constitutionally protected interests that may form the

basis for an action under Section 1983.  <u>See</u> <u>Olim</u>, 461 U.S. at 249-50 (Hawaii prison

regulations vesting prison administrators with broad discretion concerning inmate

placement and transfers create no liberty interest protected under the Due Process

Clause); <u>Merit v. Lynn</u>, 848 F. Supp. 1266, 1267-68 (W.D. La. 1994) (Louisiana parole

statute is broadly discretionary and creates no constitutionally protected liberty interest).

In the instant case, Julian's claim that he should have been housed in a DOC

prison facility rather than in the OPP is governed by the related Louisiana statutes, La.

Rev. Stat. § 15:566(B) and 15:824(B), which set forth the circumstances under which

prisoners convicted of state criminal offenses are to be sent to DOC facilities from parish

jails, and the myriad exceptions under which they may remain in parish facilities.  These

statutes vest extremely broad discretion in the DOC officials who are responsible for the

placement of state prisoners.  As one Louisiana appellate court stated, in interpreting La.

Rev. Stat. § 15:824 and vacating the order of a trial judge who attempted to require the

DOC to remove convicted state prisoners from Orleans Parish Prison to a DOC facility,

> [t]his statute clearly envisions that the Department of Corrections <u>may be
> unwilling or unable</u> to take physical custody of prisoners sentenced to hard

29

> labor.  In such an event, the department is obligated to pay the local sheriff
> or jailer for the costs of keeping such a prisoner . . . . The legislature by
> these enactments has manifested a <u>clear intent to leave the physical
> placement of prisoners within the jurisdiction of the DOC alone</u>.

<u>State v. Sylvester</u>, 648 So. 2d 31, 33 (La. App. 4th Cir. 1994) (emphasis added); <u>accord</u>

<u>Oglesby v. Gusman</u>, No. 09-3593, 2009 WL 3254145, at *3-4 (E.D. La. Oct. 7, 2009)

(Vance, J.); <u>Andrews v. Belt</u>, No. 07-CV-1283, 2007 WL 3046130 (W.D. La. Oct. 2,

2007) (Kirk, M.J.), <u>aff'd</u>, 274 F. App'x 359 (5th Cir. 2008).

Thus, the State of Louisiana by its broadly discretionary statutes has <u>not</u> created

a protected liberty interest in being housed in a particular prison or being transferred to

a DOC facility.  Julian has no constitutional right to be housed in a DOC prison or any

particular facility, under either the Constitution or state law.  This claim is legally

frivolous and fails to state a cognizable Section 1983 claim.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's complaint

be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a

claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

A party's failure to file written objections to the proposed findings, conclusions,

and recommendation in a magistrate judge's report and recommendation within fourteen

(14) days after being served with a copy shall bar that party, except upon grounds of

plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court, provided that the party has been served

with notice that such consequences will result from a failure to object.  <u>Douglass v.</u>

<u>United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[4]

New Orleans, Louisiana, this ___28th___ day of February, 2011.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[4]<u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.